# IN RE DUNCAN.

PATENTS; PATENTABILITY.

There is nothing inventive in carrying out a known process of producing

aluminum nitride in another inventor's furnace for the treatment of
iron ore, or in reducing aluminum oxid in the same way as iron
oxid.

No. 1056. Patent Appeals. Submitted November 16, 1916. Decided Feb-
ruary 5, 1917.

HEARING on an appeal from a decision of the Commissioner
of Patents rejecting claims in an application for a patent.
                                                    *Affirmed.*

The facts are stated in the opinion.

*Mr. Melville Church* for the appellant.

*Mr. William R. Ballard* for the Commissioner of Patents.

Mr. Justice VAN ORSDEL delivered the opinion of the Court:

This is an appeal by Harry L. Duncan from the decision of
the Commissioner of Patents rejecting claims 4, 5, 10, 11, 17,
and 18 of an application for a process patent. The general
scope of the rejected claims is shown by the following three
claims:

"4. The process of producing metallic nitride which consists
in supplying the carbonaceous charge of material to a rotating
treating kiln and thereby agitating and feeding said charge
through said kiln, in supplying combustible nitrogenous treat-
ing gas to the discharge end of said kiln to maintain a nitrog-
enous reducing atmosphere therein, in injecting substantially
axially into said kiln a jet of air engaging said gas and form-
ing therewith a substantially centralized heating flame trans-
mitting heat to the material and kiln walls without undesirable
contact therewith, and in bringing said material when highly
heated into engagement with said nitrogenous treating gas to
convert the same into nitride."

"10. The process of producing aluminum nitride which con-
sists in supplying the carbonaceous aluminous charge of ma-

terial to a rotating treating kiln and thereby agitating and feeding said charge through said kiln, in supplying to the discharge end of said kiln combustible nitrogenous treating gas to maintain a nitrogenous reducing atmosphere in the discharge end of said kiln, in injecting into said kiln an oxidizing jet engaging said treating gas and forming therewith a heating flame transmitting heat to the material and kiln walls without destructive action thereon to heat said material and effect its conversion into nitride by contact with said treating gas."

"17. The process of producing aluminum nitride which consists in supplying the carbonaceous charge of material to a rotating treating kiln and thereby agitating and feeding said material through said kiln, in supplying combustible nitrogenous treating gas to said kiln adjacent its discharge end to maintain therein a nitrogenous reducing atmosphere, in preventing undesirable ingress of air to the lower end of said kiln adjacent the kiln walls and said material, in injecting into said kiln a jet of air engaging said gas and forming therewith a substantially centralized heating flame transmitting heat to the material and kiln walls without undesirable contact therewith, and in bringing said material while highly heated into engagement with said nitrogenous treating gas to convert the same into aluminum nitride."

The invention is described in appellant's application as follows: "This invention relates especially to processes for producing nitrides of aluminum and other metals by supplying the hot carbonaceous aluminous charge of material, for instance, to a rotating treating kiln, through which it is gradually fed and simultaneously agitated. The material may be heated by supplying to the discharge end of the kiln a low-pressure diffused heating jet or stream of luminous flame producer-gas and injecting substantially axially into the kiln a high-pressure jet of air or other oxidizer, engaging said heating stream and forming therewith a substantially centralized heating flame transmitting heat to the kiln walls and material, while kept from undesirable contact therewith by the layer of dead wall gases in engagement with the kiln walls and material."

The aluminum is heated while passing through the revolving kiln 11, passing out at the discharge throat 12, and before entering the lower rotating treating kiln 1 is mixed with carbonaceous material through the hopper 28. Producer gas, largely nitrogen, and free from oxidizing material, is maintained in the lower portion of the treating kiln 1. This producer gas is injected into the lower end of the treating kiln from the producing reservoir 39 through a flattened jet 35, "having its flat side substantially in line with the bank of material extending up through the kiln so as to impinge upon the material throughout a considerable treating zone without exerting undesirable action on the kiln walls, which may with good results be coated with a protective layer of the forming material." The treating kiln is heated by the central flame 45, which is produced by a high-pressure jet of air from the nozzle 51, so axially and centrally directed into the kiln as not to impinge upon its walls. This operation is accurately described in the brief of counsel for appellant as follows: "The high pressure of this air carries it longitudinally up the kiln so that it has a definite directive action and centrally maintains the resulting flame, which is thus surrounded by a sheath or protective envelop of the nitrogenous reducing gases 61, preventing undesirable contact with the material treated. In this way a reversal of ordinary flame jet conditions is secured, since here, instead of a jet of gas or heated oil injected into an atmosphere of air, a centralized directive jet of air is injected into an envelop of combustible gas, the central portions of which progressively burn as the air jet penetrates them." It is this process of injecting into the "kiln a jet of air engaging said gas and forming therewith a substantially centralized heating flame transmitting heat to the material and kiln walls without undesirable contact therewith," which forms the basis of appellant's claims.

Three references were given in the Patent Office of patents which were held to anticipate appellant's claims. But two, we think, need be considered. A patent granted in 1905 to one Ellis, relating to a process for the manufacture of metallic iron, employed a rotary kiln similar to appellant's kiln 1, into which

iron ore with carbonaceous material was fed at the upper end. At the lower end were three openings or ports numbered, from top to bottom, 12, 13, and 14. Through the ports 13 and 14 gas was conveyed into the kiln from a producer tank similar to appellant's tank 39, and through the port 12 air was forced into the kiln.

The method of operation is described by Ellis as follows: "Iron ore mingled, if desired, with any suitable flux or with carbonaceous material is fed from the hopper into the kiln at its upper part, and as the kiln rotates the material moves gradually toward the lower end. Through the port 12 a supply of air, preferably highly heated, is admitted to the kiln, and through the ports 13 and 14 a stream of combustible gas. That issuing from the port 13 mingles with the air from the port 12, and a flame of very high temperature is produced, which heats up the thick walls of the kiln barrel and by virtue of its heat-radiating qualities reverberates an intense heat upon the mass of ore in the bottom of the kiln. Through the port 14 only producer-gas issues, and owing to its high content of carbon monoxid the atmosphere around the material is of a strongly-reducing nature. By virtue of the heat radiation from the flame above and from the kiln lining, and by heat conducted from the kiln lining to the material by contact as the kiln revolves, in conjunction with the reducing action above mentioned, the ore is rapidly deprived of its oxygen, and the iron therein contained is thereby rapidly and completely converted to the metallic state, whereupon the ore discharges into the conveyor and is taken to any desired point for further treatment. It is desirable to have the gas which enters at 14 of such temperature that its gravity is greater than the air entering the port 12, thereby preventing the too rapid mingling of these two currents. In that way the reducing current will travel a long distance into the kiln before it mixes with sufficient air to exert an oxidizing action, and by that time it will ordinarily have reached the upper portion of the kiln. By its combustion at this point heat is evolved, which assists in bringing the raw ore to the temperature necessary to effect the proper reduction in the lower portion of the kiln."

Thus it appears that the injection of the air performs the same function in both processes. In appellant's, it carries the flame centrally through the kiln, transmitting heat to the material and kiln walls. The material thus heated by radiation from the central flame is gradually fed down through the kiln into engagement with the hot nitrogenous treating gas which is injected through the flat treating jet 35. In Ellis the process "is accomplished by the employment of two or more flames or flame strata, one portion, that coming in contact with the ore, containing an excess of combustible matter,—such, for instance, as carbon monoxide,—and therefore having marked reducing properties, while another portion of the flame, more remote from the ore mass, is maintained at a high temperature, due to the presence of plenty of oxygen or air."

The patent to Serpek, granted in 1911, also cited, relates to an invention for the manufacture of aluminum nitride, consisting of two revolving cylindrical kilns arranged one above the other, and described in his claim 1 as follows: "An apparatus for the manufacture of aluminum nitride, comprising a stationary vertical chamber, a revolving inclined cylinder opening at its lower end into the upper portion of said chamber, a second inclined revolving cylinder opening at its upper end into said chamber at a lower level than said first cylinder, and means for feeding ore from said upper to said lower cylinder, in combination with an electric resistance furnace arranged in said lower cylinder and means for leading a suitable gas to said lower cylinder and furnace, and thence to the upper cylinder, said intermediate chamber having ports arranged therein to admit air which affords the oxygen necessary to the combustion of said gas in the upper cylinder." And claim 4 refers to "means for leading a suitable reaction gas to said lower cylinder and furnace, together with a baffled passage for said gas from said lower cylinder to the upper cylinder and a port for the admission of air to mingle with said gas before reaching the baffles in said passage."

Thus Serpek broadly shows a process of heating in a rotary kiln aluminous material combined with carbon in contact with a

nitrogenous reducing gas. The method of internal heating used by appellant was not in the invention of Serpek, but was solved by Ellis. Serpek, however, does disclose, so far as the chemical operation is concerned, the same process as appellant of producing aluminum nitride from bauxite or other aluminous matter. The Ellis furnace shows the heating jets and treating gases used in substantially the same manner as in the present application, except that Ellis is treating iron ore, which, technically speaking, is not the same art, but is a closely allied art. It would seem, therefore, that the Board of Examiners in Chief were justified in holding that in their "opinion the Examiner was clearly correct in holding that the chemical process and the heat treatment are distinct subjects, and that there is nothing inventive in carrying out the Serpek process in the Ellis furnace, or in reducing aluminum oxide in the same way as the iron oxide."

The question of invention in this case is concededly a close one, but in view of the highly technical art to which it belongs, we do not feel justified in overruling the expert judgment of the various tribunals below.

The decision of the Commissioner of Patents is affirmed, and the clerk is directed to certify these proceedings as by law required.                                    *Affirmed.*

Mr. Justice GOULD, of the Supreme Court of the District of Columbia, sat with the Court in the hearing and determination of this appeal, in the place of Mr. Chief Justice SHEPARD.